Now, in victory versus County Berks, Mr. Connell. Good afternoon, Your Honor. May it please the court. Matthew Connell on behalf of the appellants, if I may reserve five minutes for a moment. Granted. Now, as we're here on four separate orders of the district court, two preliminary injunction orders that were entered in this matter against Berks County, namely Berks County jail system and two subsequent orders, one of which was what I've been referring to as an implementation order dated July 15th, where the district court directed Berks County to take certain actions to provide what it called equal treatment to current female trustee inmates at the jail. And then lastly, an order of contempt that was issued by the district court. Let's go through all four orders. The first order, the district judge dissolved, correct? The court just dissolved two of three paragraphs of the order, but not the last paragraph, which at this point is the most important to my client. But the 90 day clock means the third paragraph is gone by April 25th. I recognize that that's what the Prison Litigation Reform Act and that questions whether or not that particular order is moot. Oh, it's gone. It's gone. That's what the act says, right? Why? Why didn't the district court? Maybe the parties didn't bring it to his attention. Why didn't the district court go to a final hearing on the merits within the 90 days required by the PLRA? The district court did not have any further evidence on that matter. And did the district court make the findings required by the PLRA to enter an injunction? You did not enter a final injunction. It was just a preliminary injunction. So aren't those two injunctions by operation of law no longer in existence? My understanding is that they would be under, would no longer be operational under law. And on its face, they appear moot. And the second one as well, because the second one with regards to former inmate Ms. Diaz, she too has been released from Berks County Jail. The tricky thing about the second one is we have to figure out what to do about the contempt finding, which piggybacks on the second one. And so does it stand or fall with that? Does that save it from mootness? I think under the contempt doctrine, we could, my clients could still be held in contempt of an order, even if that order is moot, if the contempt occurred during the time in which it was not moot. I think logically speaking. And they were held in contempt on July 11th during that time? That's correct. And there's a sanction, a $500 sanction hanging out there? $500 sanction, but also a council fee award of upwards of $7,000. And you have not paid that yet? We have paid that. You have paid it? We have. Okay, so you want to get that back. You want us to reverse the contempt order? Yes, we do. And how do we do that without investigating the legitimacy of the injunction upon which the contempt order was based? Well, I agree. I think that that's part of why it's not, would not be moot under this circumstance. The, if I could, just another minute on the first order. One of the critical issues is why, and why we felt that the district court overstepped its bounds with regards to paragraph three of that first order, is it purported to grant rights to non-party inmates, sort of to protect them so that the county couldn't take some other action in order to develop more equal treatment. For example, male inmates, as we know, are housed at the community re-entry center, a separate facility than the main jail. Female trustee inmates are housed in the main jail. By telling the county it cannot, quote unquote, impact any of the benefits of the male trustee inmates, it in effect precluded one way in which we could provide more equal treatment. And that seems at odds with the tailoring requirements here, if you're taking a remedial option off the table. The court goes back and forth. By A259, there's a later hearing where he wonders about, well, why not just shut down the CRC and give men the same treatment? So it's not clear to me whether he's still, maybe he's changed his mind about what was in paragraph three of the original order. If you're president of court, you might be able to garner a little bit more than what it says in black and white. It seemed to me that the district court was challenging myself and my clients with that proposal, in part because he was questioning, before him on that particular day was the contempt issue. But if one of the, and I mentioned this during an argument in the first hearing, the first preliminary injunction hearing is, there is the benefits that are at issue here, being out of the cell, unlocked cell, programming, these sort of things. There's no constitutional right to those issues. And if, because of facilities and because of resources, mainly the number of female corrections officers, the males are housed in a facility where the facilities themselves, by nature, don't have locked doors and are remained open so that the males can use toilets and the showers and things of that nature. If the question is, there's unequal treatment there, the easiest way to solve and resolve that issue is to move the males back to the main jail. So that everybody's under the same roof, under the same conditions. I made that argument in the first preliminary injunction hearing, and a result was the order telling us we couldn't do that. Right, but that's expired. That's expired, and I sure wish I could have an order from this court that said it was expired so that I could comfortably advise my clients that it won't be in violation of something that the district court told us not to do. So we're in a position where politically or mechanically with the county, what they're going to do with that building. And it very well may be that for financial reasons, political reasons, whatever it may be, they will close that building and move the males back up into the jail. That hasn't been decided by the political body, but that is something that they can do to resolve this issue. All right, you've conceded, I think, that the contempt order might still be proper even though the injunction underlying it has expired. As long as it hadn't expired at the time the contempt order was issued. I don't know the rule of law on that. I did not look at the rule of law. But what about the other order? I'm interested now in the fourth order. What's your view on that? The fourth order. If we hold that the two injunctions have dissolved by operation of the PLRA, what does that do to the fourth order? Well, the fourth order, it would, I think it would also moot the fourth order. Because the fourth order is telling us what to do, how to. Pursuant to an injunction that no longer exists. How to proceed with the injunction order. Yeah, but if you can't look at the underlying order in the context of not looking at everything. If you're just looking at the contempt order, you don't have the argument of the original order either not being in effect or you have a substantive problem with it. I mean, that's the quandary. Right. The quandary is, you know, what what can you do with the contempt order? Unless you look back because our law says. You know, you can't look back unless you're looking at the entire thing. If the contempt of the contempt order is, in fact, valid because it occurred within the period of validity of the injunction. Well, you'd have to concede that. Right. I mean, I have a hard time. Logically speaking, I have a hard time. Right. So you're conceding that. Yeah. Yeah, I would. I would concede that. OK. My I guess my concern is that if in the meantime, the injunction order becomes moot and becomes unreviewable because it's moot. Doesn't that preclude the proper due process for the contender or the alleged contender to be able to have another court review that contempt order? And it seems to me that, well, I suppose we could remand it to the district court to reexamine the propriety of the contempt order with the knowledge that this court has held that the two injunctions are are no longer in effect. Right. Doesn't that doesn't that give you some process? That would that would give that would give my client's process to be able to review the validity of that order. So if we reach the validity of the order, does it comply with the PLRA for additional elements on top of the usual standard? Does what comply with? I'm sorry, your honor. What's your argument on the at least the third or fourth orders as to whether they comply, whether they're narrowly drawn, extend no further than necessary to correct the harm. Least intrusive means necessary and they give substantial weight to adverse impacts on public safety for the operation of criminal justice. So the thirty six, twenty six, a factors. Our position is, your honor, and if we look at the protection standard, they're almost hand in hand. Well, first of all, you're mentioning I assume you're saying assuming arguenda, we apply intermediate scrutiny under equal protection. Here's how it goes. We can talk separately about whether intermediate scrutiny or Turner versus safely apply. So let's bracket that question and say even assuming it's that standard, it's your argument. Thank you. What the judge is essentially doing is he's he's interjecting himself. What the district court is interjecting itself into the daily operations of the facility, which is not limiting the scope of the injunction order. He is actually directing the jail what to do on a point by point basis. Now, granted, one of the arguments we make with regards to July 15th order is that it's exceptionally vague using terms like space accommodations and the space accommodations, limited lockdowns and freedom of movement and visitation policies without defining what those are without which does not give the defendants, the jail, the opportunity to identify those in all of these lawsuits. So you're you're arguing to us that your clients are confused as to what it is that the plaintiffs were requesting. I thought that the that the papers were fairly straightforward. You know, here are the inequities that we see. Here's what we'd like. Is that not the case? There are some that are more direct, but there are others that are not direct. For example, with regards to the issue where they where they requested they be able to retreat to a cell. And I know opposing counsel in their briefs objected to this, but we weren't put on notice that anybody was asking that they be printed, be permitted to retreat to a cell. In other words, males in the in the CRC are allowed in their day room during the day. And because they have a cell, presumably they can go back to their cell if they choose to do so. Their their position is and they argued it. And as we point out in briefs, this issue didn't come up until the very closing of argument after the primary injunction hearing on May 15th. Where and it was actually the district court that asked the question or use the term retreat to a cell first. Our argument is we didn't get a fair opportunity to rebut that during the hearing. I think that to a degree, that's what you're referring to, that we did make some argument in our briefs that we weren't given the opportunity to respond to some of these issues. And it seems with each of the new plaintiffs and between the two plans that are currently here, there was another preliminary hearing that the district court denied. And it was in each one of these hearings, each inmate brought up some new condition that they felt that they were entitled to. And this brings us to the question of a side by side analysis versus allowing the jail to create their policy or to make changes, if possible. Rather than taking a look, a side by side look at male quote unquote benefits and female quote unquote benefits as the women's corrections case out of the district, District of Columbia said, allowing the courts to make a side by side analysis to identify what benefits are equal and who, how equal the benefits should be completely eviscerates the deference that courts are mandated to give the jails. One of the difficulties here is in practical reality is. Well, what's the degree of deference? I mean, my colleague alluded to Turner deference and is the right standard being applied? I know that your argument is that you meet intermediate, although there's some mention of whether Turner deference is appropriate. And if so, you know, how does that apply here? The point that you're making here is obviously deference in that context. So why don't you just talk about the context of this case? Primarily, the concern is the district court is going through and making a side by side analysis. It's quite clear in the orders. It's quite clear in the papers. And frankly, it's what the appellees in the preliminary injunction request. They request identical treatment. And that is almost impossible to work under the Turner deference. I'm sorry, you're giving me a practical answer to the question. And I'd like the sort of legal theoretical right, which is there are cases which say that with regard to racial classification, there should be no Turner deference. Right. And and what the first thing I'd like to ask you is why is sex a sex based discrimination claim? We have here different than a race based because I presume that you can see that there is none. And if that's the case that I would not know, you're going to get to respond. OK, I'm sorry. So if you if you concede that there is no substantive difference between the two, then the question would be, why would there be Turner deference? In this instance, if there wouldn't be in a race based classification. So if I if I may start, it'd be difficult in an area to analyze that where I believe that there are substantial differences. And the differences are within state law and very and cases that have held that the segregation based on male and female is constitutional. The Supreme Court, I don't have a case in front of me, but the Supreme Court has ruled that it's in our briefs, it's in our papers. And the reason for the separation or the segregation of males and females is the state law. Title 37 mandates it with regards to living quarters. There are some exceptions to that special special housing units which are medical and mental health units. They can do some programming together. That's OK. But they can't live in the same units together. Doesn't the PLRA require some kinds of segregation and same sex guards and protection? Priya Priya requires it. I don't know that under the Prison Mitigation Reform Act. Priya requires it, as does state law. So sex based segregation is constitutional and acceptable. Except there's a lot of comment on why that is. OK, because of that, there is a distinction between Turner deference and requiring exact, precisely exact treatment. And. And the issues is the issues are because segregation of gender is acceptable, constitutional and the standard, we have to look at the facilities available to the government in providing the housing that is required. We have to look at the resources that are available to the government in order to provide separate housing. And when I say resources in this particular case, I'm not necessarily talking about dollar figures. And that's talked a lot about in the response briefs here and in the amicus brief we address. So in this case, the evidence of record. I'm sorry. Let me let me just interrupt you. It's I'm confident it must be my mistake. And so I beg your pardon. This has nothing to do with what I'm asking about. So Johnson v. California. Right. OK. Right. So the Supreme Court says that there's no deference to prisons in that situation when it comes to race based classification. There's no Turner deference. Right. So the reason I'm asking you about comparing race based discrimination to sex based discrimination is if Johnson says there's no Turner deference in race based discrimination. Right. Unless you can draw a substantive distinction between race based discrimination and sex based discrimination, then it would appear that we shouldn't give Turner deference. In this particular circumstance, all it means is, as I read the cases, is it's it's it's not rational basis, it's intermediate school. So I just I just want to know where you are on that and then we can move on. And my apologies are your honor. I'm not sure if I'm completely following you, because I think I am drawing a substantive distinction between sex based segregation and race based segregation. Discrimination, not segregation. I'm sorry. Well, or discrimination. And if we're talking discrimination, we're getting into the equal protection. The question is, what's the basis of the discrimination if in Johnson and the race based cases is we're not providing services because of a person's race? I don't know what the what the underlying factors is, what what the underlying factors could even be there, because there's no requirement that races be separated in housing, in in the jail or an institution. There is a requirement that genders be separated. And because there's a requirement that genders be separated, there are circumstances, all circumstances where they are, where the genders are separated based upon housing, which is why I'm using the term segregation. And maybe that's an awful way of saying it. But males have to live in one side of the building. Females have to live in the other. Or, as in this case and in many cases, males live in a completely separate building. It may be that you are confused because Judge Greenaway, I think, was talking about race disparities or discrimination generally. But Johnson is a case about explicit facial racial segregation and classification. And you're defending a sex based segregation here. But that's, you know, so Johnson isn't speaking to this situation. The question is, do we read Johnson more broadly as saying no turner deference in any kind of racial disparities that aren't express? And you're you're talking about a sex based difference that isn't women aren't eligible for this. How do we deal with the facilities issues here? So what what's most analogous? We're grappling with dueling analogies. Well, I think what's more analogous here is if we look at the clear case decided throughout our brief, the there's two cases out of the District of Columbia, District Court case, women's prisons and a case of the D.C. Circuit, which all address in some form or fashion gender based segregation and the impacts on females because of that segregation. Let's talk about pits from the D.C. Circuit. Yes. Pits said when we're talking about a programmatic distinction, the women were housed much further from the district and the men were not going to apply Turner difference. Right. Because that's not about day to day operation of prisons. That's about just the whole facility was just cited in a much worse way. Is this case like that or is this a case of day to day operations? So if we view pits as persuasive, it's not binding on us. But what now? What what lesson would we draw from pits if we were persuaded by it? I agree that we're talking about. I agree that we're talking about operations or programs, actually, which is what was analyzed by programming available. But all of this merges together here in our case. Each of these issues, because we do have two separate facilities affecting one classification of inmate, whether they be male or female, the trustee classification as a natural flow of the need to separate. And frankly, to develop more space to allow males to allow more space in the main jail. They opened the CRC some years ago, created that and put the male trustee inmates in that facility. And the female trustee inmates, because of numbers, remained in the jail because of the facilities, the day to day operations of the facilities. The CRC did not have functioning locks. The CRC was built as a juvenile detention facility, which has the has communal bathrooms, for lack of better terms, in the units. So you can't lock somebody in a cell if they have to be able to get out and use the bathroom in the middle of night. That's that's code under Pennsylvania code. Whereas so operationally and facility wise, the CRC necessarily requires, quote, some level of different treatment operationally than the jail. And because the jail is operated as the testimony has been through four hearings, the jail operates the way it does with locked cells and different levels of programming because it's a more secure facility. And therefore, operationally, Turner is at issue because operationally, the two facilities that these classes of inmates are held in address up day to day operations. Now, there's also a programmatic element here, as was in pits. And the programmatic element, which really shouldn't be an issue much anymore here, is part of the claim is that the males at the CRC receive different programs than the females at the jail. Some of the programs at the CRC are not available at the jail. But there are equivalent programs at the jail. And that gets us into the side by side analysis versus and whether or not the district court overstepped its bounds by directing the jail to do what it did in the first P.I. order, whether it's moot or not. The judge told the jail, you have to give her the exact same programs as at the CRC. Our position is under Turner. That is an improper order because it directly impacts day to day decision making. By the jail. Let me ask you a question on this mootness issue. So. Preliminary injunction order is entered. Within 90 days, you have a compliance order and you have a contempt order. We know that at the end of 90 days. The preliminary injunction ends by operation of law. Any is it your understanding that the contempt obviously is still there? We talked about that is the compliance. Any compliance order that went along with that? And with regard to the preliminary injunction, that's still in effect after the 90 days. I would argue understanding of the PLRA as it relates to that. I would argue that it's not at this point. You can't have an order directing you to do something as a result of an order that no longer exists. With regards to the implementation order. Help me to understand how the capable of repetition and not capable of repetition and evading review doesn't apply here, because it seems to me you can have a district court enter the order. The defendants say four corners. You know, we're just going to we're just going to wait because we know in 90 days it's going to. It doesn't matter. This is theoretical. Don't take this. Our position is that it does apply, that the capable of review let evade review does apply here, which is why we argue in our papers. It only applies if the parties don't bring to the district court's attention or the district court doesn't take its own cognizance of the fact that the district court needs to proceed to a final hearing on the merits within 90 days. So that doesn't evade review. Does it? I would agree with if we remand this case and the district judge wants to enter a new preliminary injunction order, then the district judge has within its power to enter a final order reviewable by this court. But if it does that, it has to make all the findings required by the PLRA. None of that happened here. Right. I would not disagree. You make just as a point of information, did any of the parties request that a final order be entered? No. OK. All right. You've time for rebuttal. We'll hear you again, Mr. Connell. Let's hear from Miss Gay. May it please the court. My name is Suman. Yay. And I represent the appellees. Teresa Victory and Alice Velasquez Diaz. Berk County created a community reentry center for a very noble goal of rehabilitating its most trusted prisoners and to aid them to reenter society and to decrease recidivism. But it is only available to men and not to women. So I want to respond to a few of the questions that were raised. First of all, intermediate scrutiny does apply here. Johnson versus California should be applied in gender discrimination cases specifically. That's a 2005 case. The rationale there certainly applies here. And in other contexts of prison litigation, the Turner standard does not apply. For example, Johnson was about racial steering in selling. Right. That's correct. It was. There was an unwritten rule, as I recall, that people of one race would be would be put in a cell only with people of the same race. That's correct. It was sort of during the first. I can't remember the exact time. Sixty days or somewhat. They were housed together by race. I think it was in California. But under the evidentiary record, no other prisons really do that. The United States actually intervened, explained that there are a lot of benefits to racial integration. And if there are specific instances where race must be considered, the prison may still do that. But it must do that under the scrutiny. All right. But that was a blanket policy that sorted people at intake. Is that fair to say? Yes. Here are we dealing with a case where it's day to day programming. We're dealing with whether there is a toilet and a sink in the cell or not. Whether the visitation is interrupted by a glass partition or not. Whether somebody is living in a day room or not. I mean, there are myriad permutations here that affect both the female inmates and the male inmates, are there not? So I think what happens in a litigation is each of these different conditions got parsed out, partly because of testimony of the different individuals and analysis. But the overall picture is that these are all conditions for the community reentry center that all are designed for the goal of rehabilitation. So when you look, there's a policy, and it's undisputed, that women are not allowed in the community reentry center. And it was undisputed that the conditions that women are housed in were not comparable. For example, much less... But sometimes they're better. I would disagree with that. What were the visitation rights of the men in the CRC? The men's visitation was you could sit across from the table... No, time. How many visits a week? They were allowed one visit a week. How long? For 45 minutes. Women? It's, I think... Three a week, unlimited time. Three a week, unlimited sounds a lot better than once a week for 45 minutes, right? I will note specifically that the testimony from the clients were that the quality of the visits was markedly different. Because it was through glass, it was very noisy. And so I think that's what really the court looked at, which was the quality of the visits was far inferior for the women than it was for the men. Counselor, your argument against Turner deference, though, I think it's conflating segregation with disparate treatment. Okay? You're not disputing that segregating men and women into two separate facilities is constitutional, correct? We do not dispute that, correct. Right. Now, under Johnson, you can't do that facially. Johnson says strict scrutiny. That's why there's no Turner deference. We understand race and sex are very different. You don't segregate the races. We do segregate the sexes. And the PREA requires us to segregate the sexes for the safety of inmates and the reduction, elimination of rape. Isn't that a powerful, at least congressional judgment, if not longstanding prudential one, that the race and sex are different for purposes of prison deference? But I think that's incorporated by the intermediate scrutiny standard, which must look at an important governmental objective. And I think where Turner might apply here is that in the remedial phase, it is extremely important to balance the principle of prison deference and looking at what might work. But your objection here is not to classification per se. Your objection is that there is disparate treatment, or they might say disparate impact, going on, and that the toilet seats are unequal, the visiting is unequal, et cetera. Well, the overall conditions for the men and women were not similarly situated, based on the extensive testimony, the multiple documents that the court reviewed. Okay, I've got that. So we had this argument about what level of deference we apply. The next analytical step is we all agree we're under the PLRA here. Did the decisions below make findings that satisfied not just the regular PI standard, but the additional four factors required here before entering an injunction? I don't want to interrupt you. Go ahead. Okay, so I believe that the district court did meet the requirements of the PLRA, which is that it must be narrowly tailored, and it certainly did that. Correct me to where in the record you think satisfied that. Tell us what the findings are. Normally district court, when it enters findings, it will do paragraph by paragraph. So the findings, in fact, address a variety of issues. First, it starts off finding. Point us to what they are. Tell us what the findings are. The district court found. The district court found that in terms of the treatment, that there were no locks on the doors, that the women did not have the same access to various privileges, including phones, microwaves, showers, communal meals, or eating outside of the cell. And I will note that this is at, and I apologize, the appendix is a little confusing. So the appendix filed under 19-2193, page A52, I believe, talks about some of this. The out-of-cell time for men was 19 hours a day. In contrast, for women it was only six hours a day. There was also a lot of evidence, and the court found, that lockdowns drastically impacted the out-of-cell time. That was specifically at A44 to A45 at 19-2193. And similarly for Ms. Victory, he found that there were key differences in programming. And for Ms. Velazquez-Diaz, he found key differences in visits. So where did the court then apply the 3626A factors to these findings? Walk through how it satisfied narrow tailoring, no further than necessary to correct the violation, least intrusive means, substantial weight to adverse impact on public safety, and the operation of the criminal justice system. Well, I think that's exactly what it was attempting to do. Point me where in the decisions you think the court satisfied those requirements. Under the conclusions of law section, Your Honor. Okay, where? So specifically in the, on A55 of 19-1329, he kind of gives the outline. 19-1329, appendix volume 2 at A55. Appropriate limited remedies on a preliminary basis, narrowly drawn, security concerns. Okay. And the discussion on security concerns is on, hold on. He quotes the standard, and it has, it doesn't seem to walk through each of these four prongs individually. It just goes and says they're satisfied. Well, and then he talks about sort of the different rationales that he disagrees with, and that would be, in this opinion, A49-50, or some of it starts at A42, talking about why the security interests are not compromised. And I believe it continues later at A49-50. Okay, 49, thank you. And then in the subsequent opinion, I believe that's at, so that would be the one filed under 19-2193. I have A46-47. A46-47 is the end of it. It's the other appendix. In the 2648 appendix? That's not, it's not at A46-47. I'm sorry. If you don't have it handy, move on. What did the district court say about the union bidding rules? So the court did listen to the testimony, but there wasn't extensive testimony on how that bidding worked. Instead, what the court looked at. Did it make any findings of fact about the, or conclusions of law, about how the union bidding rules affected the allocation of female guards? Yes, because he found that there were either 32 or 33 female correctional officers hired overall, depending on if you're looking at January or May. That's why there's a 1% difference. And then the bidding system, as well as sick leave, affected how many were available to be assigned. So that was either 21 or 22, depending if you're looking at January or May, that were available to be assigned throughout the prison. So that incorporated. Where was that finding, and what page of the judge's opinion? Or what paragraph? I believe it's, so if we're looking at the second, I believe it's the second pen in 1921, maybe 847. I apologize, that's actually not correct. But he did make specific findings of fact with respect to the staffing issues. I'm trying to find out where the findings were about the union bidding rules relative to the staff. Yes, he does mention the bidding. What I'm trying to get you away from is, I'm suggesting, speaking only for myself, that mentioning isn't good enough. Because district judges mention a lot of things, but they make findings. Sure. We review the findings, so I'm trying to find out. I couldn't find the findings about the bidding rules. So if you could direct me to that, that would be great. Okay, so A43, which is the appendix, at least I have marked 19-1329, so that would be the opinion of January 15th. So he notes, six female correctional staff members are in bid positions, meaning Berks County cannot freely allocate those personnel throughout the jail. As a result, Berks County may assign approximately 22 female correctional staff members to post throughout the jail and the CRC. Thank you. I also just wanted to comment on one – I apologize. Go ahead and make your comment, and then I'll stop. You had a question about whether the court had made a final injunctive order, and the answer is no, because both of those individuals had been released by that time. So that explains why. We would have certainly moved for that. Wait, wait, hold on. You're saying the district judge couldn't have reached – made a final order because the inmates were released? No, so specifically, Teresa Victory, the first order, so it expires after 90 days, but after 90 days, she was no longer the facility. Right, but that doesn't explain why there was no final order entered for Ms. Velazquez-Diaz. She similarly was released before the 90 days expired. It's not in the record because it happened after the briefs were filed, but it was roughly August 16th or 17th. She was released on what day? I believe August 16th or 17th. Well, her injunction, I don't think, expired until August 18th, right? That's correct. That's 88 days. Right, so – If the district judge is following the PLRA, hopefully – I guess they could wait until the 90th day, but one would hope they would enter the final order on the 70th or the 80th or the 85th day, right? So it could have been done. Sure, although we – Did the parties ever ask for a final hearing on the merits? We did not because we knew her date of release, that she would – the order would not – we would not need an injunctive order past the 90th day. But you've got a class action. You're concerned about the whole class, not just these two, right? That's right, and that's why we moved on behalf of the whole class at a later point in a separate motion, which was then granted based on the record. But has there been a final order entered in that case? No, because the 90 days has not run for that particular order, and that's why trial is scheduled for November 12th. So a couple other things maybe you can – I just want to follow up on this. So here's what I don't understand. Based on what Judge Hardiman's just asked you, the 90 days is going to run before trial. So except it stayed. He's entered a stay. Okay. Yes. Does that stop the clock on the 90 days? He's tried to stay the 90 days of the PLRA. Can he stop the clock? Can he? Well, actually, it's the Third Circuit that has stayed that particular order. So I don't – Well, we stayed the 15th order until the 19th. But when he entered the August 7th order, he immediately stayed it. That's correct. So the question is, does that stop the 90-day clock from expiring? And if it doesn't, then shouldn't you stop the 90-day clock before you get to November? I do not know the judge's position on that. Well, what's your position on that? Do we understand the – I won't speak for my colleagues. They probably understand already. I want to know, is there a final order with regard to the new class action? The answer is no, I presume. Correct. There is no final order for the class action. There's a preliminary injunction, which the 90 days has not yet run. Right. And the PLRA obviously applies to that, right? Yes, it does. So before those 90 days are up, there's something magical that's going to happen, we're hoping? Well, from a strategic point, we have to make a decision whether we move again for the court to make additional findings. Is it your understanding, I presume the answer is yes to this question, that either you or the defendants could move for a final order, presuming that both sides have a vested interest in either it being not finalized or it being finalized? Yes, we certainly can do that. Counselor, okay. I don't know if you have anything more you want to say on that point. No, no. So this is a complicated case with five different parts, and feel free to tell me that the answer is in the fifth one that's not before us. But the injunctions we're talking about, the preliminary, but all of them are affirmative. They're mandatory injunctions that require do this with a toilet seat, provide this kind of visiting, and so on and so forth, right? Correct. They're not just prohibitory injunctions. Correct. And we've got a standard under Trinity Industries that we confine these to the most unusual cases. The right to relief has to be indisputably clear. Now, I understand your position is that you were indisputably entitled this relief, but was there a decision below on whether, in fact, this was indisputably clear and this was the most unusual case that merited a mandatory injunction? I didn't see it. Well, we argue that the district court was proper in its issuance of the preliminary injunctions. It made the proper findings of fact. Did the district court address the standard for mandatory injunctions having an indisputably clear right to relief? I believe it did. Where? I believe it said that in – well, I mean, it certainly – when it talks about the appropriate limited remedies, on one basis – Could you tell me where? Yes. I think that in the section where it talks about public interest, it certainly makes a number of findings with regards to these arguments against the security interest. And the context is that the defendants argued that because of female staffing issues, that it could not provide for equal treatment. Are you in 19-1329 Appendix Volume 2? Is this the decision you were citing earlier? You were talking about A42 through A50? Yeah, I am at – I'm at 19-1329, and the appendix page A51 – A51. – specifically talks about the injuries to Ms. Victory. Yes. And I think the other opinion would talk about Ms. Velasquez. All right, but is there any discussion of whether the right to relief – this is the most unusual case, or the right is indisputably clear here? Our position is that the court did do that. I mean, it's made extensive findings of fact. And in the very beginning, in the prologue, if you will, it kind of explains the rationale, why he thought it was an extraordinary case, and, you know, the differences that he saw. I don't want to beat a dead horse. That's fine. Maybe you could talk about irreparable injury here. Yes. The district court seemed to take the position that any violation of a constitutional right is irreparable injury, but the cases cited appear to involve things like elections, where you use it or lose it, it's over and done with. There are lots of times when people suffer a deprivation of a right, and that doesn't mean they automatically get a preliminary injunction. It satisfies irreparable injury. What makes this one an irreparable injury, not just being a constitutional right? Correct. So I think you can see it as two ways. One is the constitutional violation we are discussing is not these individual pieces, but overall the unequal treatment of the women trustees as compared to the men trustees. And you agree that if they were to get rid of the CRC and have no special status for men, your case goes away, right? There's no injury of disparate treatment after that point. Well, unfortunately, that would be the case. I mean, we would hope for other reasons they would not do that. So, yes, the county could choose, and you're not aware of anything that prevents them. Assuming that Paragraph 3 is gone under the PLRA, there's nothing that prevents them from opting for that remedy as opposed to, obviously, you prefer a different remedy. Right, right, right. But if they are going to offer particular privileges and programs, it should be offered to both men and women. And specifically with the irreparable injury part, one is Heckler v. Matthews, a Supreme Court case from 1984, does talk about how just discrimination itself is invidious enough for ungendered discrimination to cause irreparable injury. But also, in addition, here what you have is you're looking at the missed opportunities of women trustees who'd be in an environment that's going to be looking at aiding their reentry, decreasing recidivism, and you can't get that back. You can't get those missed opportunities back for whatever reason it is. And so in that sense, it is an irreparable injury that can't be compensated solely through financial means, through compensatory damages. So we believe that, and I also want to say that I do think that Hook's case carries over into this context, which is the election case that you were discussing. Talk a little bit, if you will, I don't think you answered this particular question, about the sort of procedural quandary we find ourselves in. You know, the 90 days has passed, a couple of them. On one of them there's a contempt order that's outstanding. What's your views on procedurally how we can get to the merits of those orders? Right. So there are some challenges with mootness and standing, although we believe similarly that some of the concepts behind the exceptions to mootness apply. For example, the women and the men actually trustees are inherently transitory, as looked at in Gernstein v. Pew and Garrity. And because this is now a class action lawsuit, that particularly applies here. Now the way it makes it complicated is because that last order has only just been appealed, but overall that's also before the court. So I think those exceptions to mootness do apply here. What do you do with a class that the likelihood is in their entirety will not be at the prison? I forget about when relief may or may not be ordered, but just during the process of trial, I presume that that's where the capable of repetition comes in so that. Yes. So unfortunately we have encountered this situation in the past. My organization, along with others, have looked at conditions in pretrial detention, people who are in police holding cells for like 24 hours. And the thing is when there's a policy, which we allege is unconstitutional, we get other people coming forward. And based on the case law of class actions, you can have your main plaintiffs still be represented in the class. Obviously we have a burden to the court to establish that these things are still going on and that people are still being affected and that people within the class, which includes current and future individuals, not just the past people. Well, that's sort of very logical as it applies to class actions. But as it applies to these individuals, how do we get to the merits? I think that is a greater challenge, I will admit. And I think the reason why you are able to is because of it being in the context of a class action. But, you know, I will note that originally we did argue that the first order was moot because it had been dissolved and she had been released. How does, forgive my ignorance on this, but how does this work with opt-out? This is literally a proverbial captive audience. The case is for injunctive relief only on behalf of the class, so there is no opt-out provision under Rule 23 for the class actions for injunctive relief only classes. We're not seeking damages on behalf of the class. So if, but if, what if some of the female inmate, trustee inmates, would rather be in their current accommodations of confinement, conditions of confinement, rather than in a day room or rather than in the gym with one day a week visit. You know, what if some of them said, I'd rather have three days a week unlimited visitation through a plexiglass than one day a week, 45 minutes? What happens to them? Okay, so that brings up two issues. One is a sort of a practical rules of professional conduct. We, as their attorneys, really need to talk to as many people in the class and determine what it is that affects them personally. And then as another matter, I think a lot of the federal rules do contemplate that. So, for example, if you have a class action settlement, there's a whole process allowing for notice to the class and people to object, which the court may take into consideration, to hopefully take into consideration all the different perspectives or conditions that people are under. But it's majority rules. If you win and you get everybody moved into the CRC, but there's 20 women who don't want to go, because you've talked to enough of them and the majority want to go, then those 20 have to go, too? Well, the other thing about if you have a final order, you are going to have, you know, a trial, which is an adversarial system. So hopefully those points of views will also be brought in. But it's not just a majority rule. It just seems like I'm wondering who advocates for the dissenters, I guess. Maybe there are no dissenters, but there seems to be some possibility of dissenters who aren't on board. Right. And so I will say that in settlement situations, there is a process, and I've gone through it, where we give notice to the class, people have opportunities to write, or, you know, whatever the system is set up, they're notified through the notice on the wall. And here I will note that there is a notice on the wall, so that people are aware of it, they have opportunities to contact us, whatever their opinion is. And we have an ethical duty to incorporate that. Okay. And I will note that we actually did do that. The court doesn't always agree with us. The court, pardon? Doesn't always agree with, you know, our position. At the last hearing that happened, we brought up a number of concerns, and then the court obviously makes its decision based on the evidence before it. Okay. All right. Thank you very much, Ms. Yeh. Thank you. We have a few minutes of rebuttal from Mr. Connell. May I please? Thank you. If I could pick up right where the discussion went off, this is precisely what we're talking about being a problem for guests. If the class council talks to all the class members and gets from each one of them, what don't you like? I don't like the softness of my pillow. I don't like the color of my mattress. I don't like the number of toilet paper, the sheets of toilet paper I get, or the softness of the towels. Where does it end? Each one of these come in and say this is kind of unfair, right? I mean, this isn't a frivolous lawsuit. I'm sorry? Yeah, I mean, you're talking about sort of the window dressing aspects of being in jail. I mean, I was focused more on the, I don't know, I would assume when you get to see your loved ones is more of a substantive thing than the quality of your pillow. Maybe I'm wrong on that. I don't know. I understand. But one of the things that we've been ordered to do is to change toilet seats when there wasn't even any evidence as to what the toilet seats were, okay? The district court ordered us to change toilet seats. When it came up, I thought one of the plaintiffs was upset that the stainless steel was cold or something. But there are no toilet seats. In some units, there are stainless steel toilets. In some units, there are ceramic toilet seats. But that's what we're talking about here. And that's why, is it unfair and hyperbole? Yes. But I also think that ordering the changing of toilet seats is also hyperbole. Well, you're not in trial, baby. This is the appellate court. You know, we're uninterested in hyperbole. But to Judge Hardiman, to your point with regards to visitation, at the end of last hearing when the district court asked that question of counsel, what do you do when you have an inmate who wants to have the three days a week and longer visitation rather than the one days a week? And counsel's response to that was, and this is talking about the exact reason why side-by-side comparison is not appropriate, their response was some women might prefer more frequent and longer visits with partition and shorter and less frequent visits without partition. So you should give them the choice. This isn't a made-to-order operation in a jail. Part of the problem we have, though, is this is a moving target for us to figure out what we're even reviewing. You don't have to answer, but do you have an intention to ask for a final order or something we can review, even if it's an order you don't like, just getting it baked in such that we're not under a 90-day clock and we can review it? And I'll have to discuss that with my client. Of course, there's a danger for any time the attorney suggests something that is something they might like, but I understand the court's position on that, and I will discuss that with my clients. If I could just comment briefly on another issue that came up during the last discussion, the number of female officers. One of the things that the district court got completely wrong, misunderstood, I think, and one thing that in the briefings that the appellees got wrong, by mistake, I think, is the issue of the number of female corrections officers. In each case, in the district judge's findings of fact and conclusions of law and in the briefings, they point to our argument that we say we need, in order to put females in the community corrections center, the CRC, we need to hire six female officers. And the response to that is, why do you need six officers? You operate all the time at the jail with one female officer, and that's true. We would need a female officer to cover 24-7, and there is testimony and there is evidence that in order to cover one duty post, i.e., one position at the CRC or one position at the jail, you need six bodies in order to cover that duty post 24-7. Because it's a less restrictive environment. Well, because the numbers are simply... So this is like morning shift, evening shift, night shift, weekend shift, piecing them together. And covering days off and sicknesses, illnesses and things of that nature. Their staffing analysis says you need six bodies to cover a duty shift. If we're going to put a full-time female corrections officer at the CRC, that means they have to hire six full-time female corrections officers, which is an impossibility in today's world. They've been trying. So in that effect... How does the district court ascertain how hard you've been trying to do that? Well, he hasn't. We did put on testimony from the warden in the initial hearing that she has made efforts to community reach out. She goes out and talks to high schools. She goes out and talks to colleges. Were findings made by the district court about her credibility on that issue? I don't believe so. How is it that you're arguing both impossibility and substantial compliance? Well, impossibility because we don't know what the court is really saying, okay? Substantial compliance is... And this goes to the contempt issue, and this is what I really wanted to have a few minutes to get to. If you look at the substantial compliance, the warden's affidavit... Now, granted, it may not have been called a plan, but it was an affidavit, and there's nothing telling us what a plan is. Putting that aside, the warden said, we can, and upon order of the district court, will move inmate Diaz into the overflow unit, which provides some greater level of movement than a cell does. There was also... The second issue was also the question of visitation. There is testimony from Captain Castro at A287. This would be in the appeal of the contempt order, 2695. A287 through 291 and A307 through 311. Of the efforts that the jail went through to try and determine how they would comply with the order directing that Ms. Diaz be allowed out of her cell for 13 hours, that the cell doors be unlocked 24 hours, and that she be provided the visitation that the court ordered. The case law says in order for there to be substantial compliance, you look at the diligence of the efforts of a party or the alleged contempt order and what they did to try and comply. That's why we would argue that there's substantial compliance. The district court obviously disagreed with that, as demonstrated in the July 11th hearing. But as to whether or not there cannot be compliance, there's no way to comply with what the court ordered in a safe and secure manner. Even the efforts that we later came up with. What findings were made on that issue? I'm sorry? What findings were made on the issue of safety and security by the district court? The district court simply said that he finds that our concerns about safety and security are speculative. That's what his findings state. And there has been ample testimony through four or five hearings as to the safety and security concerns by the jail under the circumstances provided here and to the effect that even Kathy Castro testified when they analyzed these sort of things. It's the first thing they talk about. It's what they talk about through the entire discussion. And it's the last thing they talk about safety and security. How did they do it under those circumstances? That's what they're charged with. Okay. Thank you, Mr. Connell. Before I let you go, I have to admonish you. We got a brief at, I think, 6.55 a.m. this morning from your side. We got a brief at 6.55 in the morning today. You're not familiar with that? It came from you, I think. I'm sure. Somebody filed it at 6.55, and I'll accept that admonishment. You know, we have these electronic devices, and we get these things, but if you want us to give due consideration to them, you can't throw them over the transom the night before argument or the day of argument. I understand, sir. Okay. My apologies. All right. Thank you for the argument, Ms. Yeh, and Mr. Connell. We'll take the matter under advisement.